STATE of Maine

v.

**MAINE STATE EMPLOYEES ASSOCIATION, et al.**

Supreme Judicial Court of Maine.

Argued March 13, 1984.

Decided Oct. 29, 1985.

Susan Farnsworth, (orally), Linda McGill, Governor's Office of Employee Relations, Augusta, for plaintiff.

Ann R. Gosline, (orally), Maine State Employees Ass'n, Augusta, for defendant.

Before NICHOLS, ROBERTS, VIOLETTE, WATHEN, GLASSMAN and SCOLNIK, JJ.

ROBERTS, Justice.

The Maine Labor Relations Board ordered the State of Maine to cease and desist from refusing to bargain collectively with the Maine State Employees Association over the impact of certain management decisions upon employees' wages, hours and working conditions. Both the State and the union sought direct judicial review by the Superior Court, Kennebec County, pursuant to 26 M.R.S.A. § 979–H(7) (Supp.1984), 5 M.R.S.A. § 11002 (1979) and M.R.Civ.P. 80C. Upon the entry of a judgment substantially affirming the

Board, both parties appealed to this Court. Because we determine that the union waived the right to bargain over the impact of the organizational changes at issue, we vacate the Superior Court judgment and remand with instructions to reverse the Board's decision on the issue of waiver.

## I.

At all times relevant to this appeal the State, as the public employer under 26 M.R.S.A. § 979–A(5) (Supp.1984), and the union, as the certified bargaining agent for all of the affected employees, were parties to a collective bargaining agreement.[1] During the term of this contract, the union became aware through its members that the State was planning to reorganize three of its agencies: the Department of Environmental Protection, the Department of Human Services and the Board of Cosmetology. First, the State planned to create a new division within the DEP, to be known as the Bureau of Oil and Hazardous Materials Control, with expanded responsibilities for the regulation and inspection of hazardous and toxic materials. Second, the State proposed a reorganization of the Bureau of Social and Rehabilitative Services within the DHS that would involve reclassifying certain employees known as Human Services Workers and Human Services Managers, upgrading their minimum qualifications and adjusting their respective pay scales. Third, the Board of Cosmetology decided to reorganize the delivery of its inspection services by reducing the number of inspectors from three to two and by relocating its two branch offices.

Upon learning of each of these reorganization schemes, the union presented the State with specific bargaining proposals that were designed to alleviate the impact of the changes on the wages, hours and working conditions of the affected employees. In each instance, after initial meetings between representatives of both sides, the State refused to bargain on the grounds that its actions were entirely in accordance with, and governed by, the existing collective bargaining agreement.

The union filed a prohibited practices complaint with the Maine Labor Relations Board, alleging unlawful interference in violation of 26 M.R.S.A. § 979–C(1)(A) (1974), and violation of the duty to bargain set forth in 26 M.R.S.A. § 979–D(1)(B) (1974). In response to these allegations, the State conceded that the reorganization of the three agencies involved unilateral changes in the terms and conditions of employment that are mandatory subjects of bargaining under the State Employees Labor Relations Act. *See* 26 M.R.S.A. § 979–D(1)(E)(1) (1974). The key issue presented to the Board was whether the State's duty to bargain had nonetheless been waived by the express provisions of the governing collective bargaining agreement. The dispute focused, in particular, on construction of the Conclusion of Negotiations Article, or "zipper clause," by which each party agreed not to attempt to compel mid-term negotiations over matters that: (a) could have been raised during pre-agreement negotiations, (b) were raised and rejected at that time, or (c) were specifically addressed in the agreement itself.

After receiving testimony and briefs on the pertinent issues,[2] the Board ruled that by agreeing to the zipper clause the union had waived its right to compel bargaining over the State's reorganization plans because those changes were authorized by and, therefore, specifically addressed in, the Management Rights Article LVI of the agreement.[3] In resolving whether the

1. There are actually two collective bargaining agreements involved in this case but because they are identical in all pertinent respects, we treat them as one.

2. No testimony was offered concerning negotiations that preceded the collective bargaining agreement.

3. The Management Rights Article LVI expressly reserves to the State the exclusive right to manage its operations, including but not limited to:

   [T]he right to determine the mission, location and size of all its agencies and facilities; the right to direct its work force; ... to establish

right to bargain over the *impact* of those changes had likewise been waived, the Board analyzed each individual bargaining proposal and considered whether it was "specifically addressed" in any provision of the contract. Ultimately, the Board concluded that the State had an obligation to bargain over nine of the twenty-two union proposals.

The parties entered separate complaints, later consolidated in the Superior Court, seeking reversal of those portions of the Board's decision that were adverse to them. The Superior Court substantially affirmed the Board's decision, reversing only with respect to two of the union's demands that the court concluded had been waived under the existing contract.

## II.

In this case we are concerned with an unfair labor practice charge, not a contract violation subject to grievance arbitration. The MLRB has jurisdiction over the former, but not the latter. Nevertheless, the MLRB in the first instance, and this Court ultimately, must interpret the provisions of the contract in determining refusal to bargain *vel non.* This is so because section 979–D(1)(B) imposes a duty to bargain "provided the parties have not otherwise agreed in a prior written contract." In the circumstances of the instant case, the applicability of the proviso must be determined solely by perusal of the collective bargaining agreement itself.

In *State v. MLRB*, 413 A.2d 510 (Me. 1980), we affirmed the Board's order to negotiate the *impact* of holiday openings of liquor stores. We upheld the Board's rejection of the State's waiver defense as not clearly erroneous. The waiver discussed in that case was allegedly raised by *implication* from the MSEA's conduct, rather than by the express terms of the bargaining agreement.

specifications for each class of positions and to classify or reclassify and to allocate or reallocate new or existing positions in accordance with the law; ... to determine the size

In *City of Bangor v. AFSCME*, 449 A.2d 1129 (Me.1982), we again affirmed the Board's finding of an unfair labor practice in refusing to bargain over the *impact* of a unilateral managerial decision to discharge. We also affirmed the Board's determination that the union had waived the right to bargain over a discharge but not the right to bargain over the *effects* of that discharge. The collective bargaining agreement at issue provided that the parties each "voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated to negotiate with respect to any subject or matter referred to or covered in this agreement...." Discharge for just cause was covered in the agreement; the effect (impact) of discharge was not.

Neither of these decisions control the case before us because the bargaining agreements did not contain any language which could be construed as a waiver of impact bargaining. The present contract, however, at Article LVIII provides:

A. The State and MSEA agree that this Agreement is the entire Agreement, terminates all prior Agreements or understandings and concludes all collective negotiations during its term. Neither party will during the term of this Agreement seek to unilaterally modify its terms through legislation or other means which may be available to them.

B. Each party agrees that it shall not attempt to compel negotiations during the term of this Agreement *on matters that could have been raised during the negotiations* that preceded this Agreement, matters that were raised during the negotiations that preceded this Agreement or matters that are specifically addressed in the Agreement.

(Emphasis added.) Although we agree with the Board that paragraph A is meant to be an integration clause, the language of

and composition of the work force; ... [and] to install new, changed or improved methods of operations.

paragraph B is clearly broader than that in *City of Bangor*, and serves as a waiver of impact bargaining over the organizational changes expressly permitted under the Management Rights Article.

The leading case of *NLRB v. Southern Materials Co.*, 447 F.2d 15 (4th Cir.1971), is instructive. There, the employer had discontinued paying a Christmas Bonus (not expressly covered in the contract). The NLRB determined that the union had the right to negotiate over Christmas bonuses despite the waiver language of a "zipper clause" that covered "any subject matter referred to or covered in" the contract as well as "any subject matter not specifically referred to as covered in" the contract.

The court reversed the NLRB, distinguishing such cases as *General Electric Co. v. NLRB*, 414 F.2d 918 (4th Cir.1969) and *Timken Roller Bearing Co. v. NLRB*, 325 F.2d 746 (6th Cir.1963) because they dealt with waiver by implication. The *Southern Materials* court determined that mid-term negotiations had been waived *regardless* whether the bonuses were included within a maintenance of benefits provision of the contract. Had bonuses not been included, the zipper clause would preclude mid-term negotiations. Had bonuses been included, the mid-term negotiations would still be waived but the employer would be in violation of the contract and subject to grievance arbitration rather than the unfair labor practice jurisdiction of the NLRB.

Although it does not discuss *Southern Materials*, MSEA attempts to distinguish the more recent cases of *NLRB v. Auto Crane Co.*, 536 F.2d 310 (10th Cir.1976) and *Aeronca, Inc. v. NLRB*, 650 F.2d 501 (4th Cir.1981). In *Auto Crane* the employer made a unilateral increase in wages, and in *Aeronca* the employer ceased distribution of Christmas turkeys. The contract language in those two cases, although similar to that in *Southern Materials*, adds the additional language "even though such subjects or matters may not have been within the knowledge or contemplation of either or both parties at the time they negotiated or signed this Agreement." In each case the Court held that the NLRB erred in finding no waiver of mid-term negotiations, and enforcement of the Board's order was denied.

The MSEA contends that the zipper clauses in those cases were much broader than the zipper clause in the case before us. Neither the *Aeronca* court nor the *Auto Crane* court suggested, however, that the additional language about matters not contemplated added anything to the waiver. Both courts simply relied upon *Southern Materials*. Moreover, we do not accept MSEA's contention that the waiver clause before us is not as broad as those in the three federal cases.

MSEA also argues that its case is distinguished by the presence in the contract of Article LV, Maintenance of Benefits. Article LV provides as follows:

> With respect to negotiable wages, hours and working conditions not covered by this Agreement, the State agrees to make no changes without appropriate prior consultation and negotiations with the Association unless such change is made to comply with law, and existing regulations, Personnel Rules, written Policies and Procedures, General Orders, General Operating Procedure, or Standard Operating Procedure.

The union cites a specific reference to the absence of such an article in *Aeronca* and a comment in *Auto Crane* that the employer had no right to act unilaterally in the first place. The MSEA's argument misses the point. A violation of the maintenance clause would invoke contract grievance rather than labor board action. A contractual and a statutory obligation to bargain may exist independently and may differ in content. *Cf. Lewiston Firefighters Association v. City of Lewiston*, 354 A.2d 154, 168 (Me.1976) (a contractual and a statutory right to parity pay are of independent origin and enforceable in different forums). In the context of municipal labor relations, we have stated that the Legislature recog-

nized arbitration as the "desirable method" for resolving contract disputes. *Id.* at 166.

■ In short, the *Southern Materials* decision, although not binding on us, is persuasive. The zipper clause in that case was no broader than the one before us. The MLRB heard no evidence of negotiating history that might affect the contract provisions. In the instant case, the State's unilateral action was specifically permitted under the contract. The statutory duty to negotiate over the *impact* of such decisions *could* have been preserved in the contract. That statutory obligation was waived.

The State argued to the Board that impact bargaining could have been raised during negotiations. The Board disposed of the State's argument on the ground that it rests on the erroneous inference "that failure to mention impact bargaining in the contract sections authorizing the changes herein is equivalent to a waiver of bargaining over the effect of those changes." The Board's opinion in this respect completely ignores the specific language of Article LVIII(B) waiving mid-term negotiations on "matters that could have been raised during negotiations." Moreover, the Board says that the State's argument was specifically addressed in *City of Bangor.* As we stated, the zipper clause in *City of Bangor* addressed only matters covered by the contract.

Next, we turn to the "sword-shield" analogy used by MLRB to describe "the proper balancing approach." The Board quotes an NLRB General Counsel Memorandum to the effect that zipper clauses may be used as a "shield" against mid-term negotiations but not as a "sword" to give the employer unfettered power to change terms and conditions of employment *not* contained in the contract. First, there is no need for a balancing test. Unquestionably, the parties may contractually waive the right to any mid-term negotiations. We need not engage in balancing policy interests when a contractual analysis leads unequivocally to a finding of waiver.

■ Second, the "sword-shield" approach is clearly inconsistent with *Southern Materials, Auto Crane* and *Aeronca* because each of those cases involved a union demand that the employer negotiate over unilateral changes of wages or conditions of employment during the term of the contract. MSEA's argument that the *impact* of the unilateral changes in the case before us could not have been raised during negotiations because the exact nature of future changes was then unknown is specious. Changes were anticipated pursuant to Article LVI of the collective bargaining agreement, and the statutory *right* to impact negotiations could have been preserved in the contract. The union may also waive that right, subject to the requirement that it do so by "clear and unmistakable language." *See General Electric Co. v. NLRB,* 414 F.2d 918, 923 (4th Cir.1969). Article LVIII(B) contains just such language.

■ Moreover, the MLRB opinion says, "[we] do not cite the [General Counsel's Memorandum] as persuasive authority; however, we believe that it accurately reflects the present state of federal labor relations law in connection with the status and use of 'zipper clauses'." Our review of state court opinions discloses no persuasive support for the application of a "sword-shield" analysis in the circumstances before us. To do so would effectively negate an otherwise valid contractual provision. If there is a sound policy basis for restricting or eliminating the right to bargain for a waiver of mid-term negotiations over the impact of agreed upon unilateral employer actions, then that policy should be reflected in legislation. There is no basis in the State Employees Labor Relations Act for the MLRB to intrude on policy grounds. Section 979–D(1)(B) of the act specifically provides that the parties may alter the statutory duty to engage in collective bargaining. We decide in this case that the statutory right to compel mid-term negotiations over the impact of these unilateral employer actions can be and has been

waived by the clear and unmistakable language of Article LVIII(B).

The entry is:

Judgment vacated.

Remanded to the Superior Court with direction to vacate the order of the Maine Labor Relations Board.

All concurring.